**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES WILLIAMS,** *et al.*, | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | **No. 10-1044** |
| **v.** | : | |
| | : | |
| **ARAMARK SPORTS, LLC,** *et al.*, | : | |
| **Defendants.** | : | |

---

| | | |
|---|---|---|
| **JAMES WILLIAMS,** *et al.*, | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | **No. 10-1547** |
| **v.** | : | |
| | : | |
| **ARAMARK SPORTS, LLC,** *et al.*, | : | |
| **Defendants.** | : | |

**M E M O R A N D U M**

PRATTER, J.                                                           SEPTEMBER 8, 2011

In these two substantially identical putative class actions, James Williams, on behalf of himself and all others similarly situated as food, beverage and service employees assigned to three Philadelphia sports arenas, has sued their former employer, Aramark,[1] pursuant to the Pennsylvania Minimum Wage Act ("MWA"), the Pennsylvania Wage Payment and Collection Law ("WPCL"), and the federal Fair Labor Standards Act ("FLSA") for damages that resulted from Aramark's alleged failure to properly calculate wages and overtime pay.  The Court granted preliminary settlement approval on March 31, 2011.  After sending notice of the settlement to class members, the parties have now filed a motion for final approval of the settlement.

---

[1]       Mr. Williams' complaints name three defendants: Aramark Sports, LLC, Aramark Sports, Inc., and Aramark.  These defendants shall be known collectively as "Aramark."

**FACTUAL AND PROCEDURAL BACKGROUND**

Mr. Williams asserts that he and other Aramark service employees working at three Philadelphia arenas were "regularly" deprived of wages, due to the fact that Aramark allegedly (1) required food and beverage service employees to work through lunch breaks and rest periods without pay; (2) failed to accurately credit employees for work performed at different arenas during the same pay period, improperly reducing their overtime pay; and (3) failed to ensure that employees were receiving proper gratuities while working in tipped positions. He also claims that Aramark failed to maintain accurate records of hours worked and of wage calculations.

Mr. Williams originally filed his case in the Philadelphia Court of Common Pleas. Aramark removed the case to this Court in April, 2010, and, in addition to moving to remand the case, Mr. Williams filed a second case, alleging the same facts but adding an FLSA claim. Defendants moved to dismiss both cases, and those motions, along with Mr. Williams's motion to remand, are still pending. Before the Court decided any of the outstanding motions and based on extensive discussions, negotiations, and analysis, the parties conducted an extensive all-day mediation with the Honorable Diane M. Welsh (Ret.). The mediation was attended by counsel for all parties and two high-ranking ARAMARK attorneys. Judge Welsh assisted the parties in negotiating both the monetary value of a settlement and the terms and conditions which would apply in facilitating the settlement. Thereafter, the parties filed a motion for preliminary approval of the settlement.

The Court held a preliminary settlement hearing in September, 2010, at which plaintiffs' counsel in a third case, *King v. Aramark*, Civil Action No. 10-2116, raised several objections to the settlement. The Court instructed counsel to meet and discuss the issues, which resulted in a

revised class notice and a revised settlement agreement.[2]  On March 31, 2011, the Court granted

preliminary approval of the settlement.  On May 16, 2011, the Court amended its Order granting

preliminary approval of the settlement at the parties' request to revise the class definition.  Class

members were notified of the settlement, the parties filed a motion for final approval of the

settlement, and the Court held a final fairness hearing on September 6, 2011.

PROPOSED SETTLEMENT

The settlement Class preliminarily approved by the Court is:

> All current and former non-administrative employees of ARAMARK Sports,
> LLC, ARAMARK Corporation, or any other ARAMARK entity, who were
> classified as hourly and/or non-exempt by ARAMARK and who, according to
> ARAMARK's time and payroll records, worked at Citizens Bank Park ("CBP"),
> the Wells Fargo Center, f/k/a Wachovia Center ("Wachovia"), the Wachovia
> Spectrum ("Spectrum"), and/or Lincoln Financial Field ("LFF") (collectively,
> "Sports Complex") and received compensation for such work, for more than one
> Qualifying Workweek (as defined by the Stipulation) between March 5, 2007 and
> the Preliminary Approval Date, or the estates or other judicially-appointed
> representatives of such persons.  The Class excludes the named plaintiffs in the
> action captioned *King, et al. v. ARAMARK Sports, LLC, et al.* (E.D. Pa.; Civil
> Action No. 2:10-cv-02116-GP).  The Class also excludes any current or former
> employees to the extent that they have already released their claims, e.g., current
> or former employees who have already released all claims falling under the
> definition of "Released Federal Law Claims" are excluded from the Class.  To the
> extent that current or former employees have released their claims, but worked for
> weeks that would otherwise fall under the definition of Qualifying Workweeks,
> any Qualifying Workweeks after the effective date of the prior release of claims
> are not excluded.

The parties have arrived at a settlement in the amount of $587,500.  This settlement

includes attorneys' fees and costs,[3] as well as capped administrative costs associated with

---

[2]      The *King* Plaintiffs are specifically excluded from the class definition.

[3]      Counsel for Plaintiff asks for 33% of the settlement amount in attorneys' fees and
costs.  The issue of attorneys' fees will be discussed in greater detail, *infra*, at Section V.

facilitating a settlement.  The monetary and non-monetary terms of the settlement are described in detail in a revised Confidential Stipulation of Settlement of a Class Action ("the Stipulation"), which was submitted to the Court on November 5, 2010.

The Settlement covers all Full- and Part-Time Workweeks (collectively "Qualifying Workweeks"), as defined in the Stipulation.  Under the terms of the Stipulation, a Full-Time Workweek is any workweek in which "32.1 hours or more are present and paid in a payroll check for time worked in an Aramark component during the Class Period according to Aramark's time and payroll records"; a Part-Time Workweek is one in which "at least six and no more than 32 hours are present and paid in a payroll check."

The individual settlement amount for which each participating claimant is eligible will be calculated as follows:

$$\frac{\text{Settlement Pool}}{\text{Total Class Workweeks}} = X$$

Full-Time Workweeks equal X, and Part-Time Workweeks equal ½ X, so each claimant will receive the total number of Workweeks he/she worked multiplied by X.  There are a total of 137,721 workweeks for the Settlement Class.  The Class is guaranteed 40% of the maximum settlement pool, so if fewer than 40% of the workweeks are claimed, the remaining unclaimed funds up to the 40% floor will be divided among the claimants.

In addition, because investigation suggested that the interests of the Class would be served by ensuring that Class Members understand how they are paid, Plaintiff sought, and the Settlement includes, mechanisms through which Class Members can learn this information.

**LEGAL STANDARD AND DISCUSSION**

**I.      Class Certification**

      **A.      Federal Rule of Civil Procedure 23(a)(1)**

      Rule 23(a) requires the following:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class; and (4) the representative parties will fairly and
> adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

              1.      The Numerosity Requirement

      "No single magic number exists satisfying the numerosity requirement." *Behrend v. Comcast Corp.*, 245 F.R.D. 195, 202 (E.D. Pa. 2007) (internal quotation omitted). However, the Third Circuit Court of Appeals often embraces classes of 40 or more. *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). Here, the Settlement Class consists of 5,817 individuals (5,814 originally identified, plus 3 more self-identified class members). *See* Mot. for Final Approval, Ex. 1 at ¶¶ 8, 14. Based on this, the Court concludes that the numerosity requirement is satisfied.

              2.      Commonality

      To satisfy the commonality requirement, plaintiffs must show the existence of at least one question of law or fact common to the class. Fed. R. Civ. P. 23(a); *In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 310 (3d Cir. 1998). The commonality threshold is low, *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996), and does not require "an identity of claims or facts among class members," *Johnston v. HBO Film Mgmt*, 265

F.3d 178, 184 (3d Cir. 2001).  Moreover, "the existence of individualized issues in a proposed

class action does not *per se* defeat commonality."  *Brooks v. Educators Mut. Life Ins. Co.*, 206

F.R.D. 96, 101 (E.D. Pa. 2002) (citing *Johnston*, 265 F.3d at 191 (3d Cir. 2001)).

Mr. Williams asserts that this requirement is met by the Defendants' common

timekeeping and payroll policies.  Because the commonality requirement is "not a high bar," *see*

*Chiang v. Veneman*, 385 F.3d 256, 265 (3d Cir. 2004), the common issues identified by Mr.

Williams meet the requirement.

3.    Typicality Requirement

Rules 23(a)(3) and 23(a)(4) require that the claims or defenses of the named plaintiff  be

typical of the class and that the named plaintiff be in a position to fairly and adequately protect

the interests of the class.  This requirement is "designed to align the interests of the class and the

class representatives so that the latter will work to benefit the entire class through the pursuit of

their own goals."  *In re Prudential Ins. Co. of Am. Sales Litig.*, 148 F.3d 283, 311 (3d Cir. 1998).

 *See also id.* at 312 (holding that "the various forms [the class representatives'] injuries may take

do not negate a finding of typicality, provided the cause of the injuries is some common wrong")

(internal citation omitted).

To evaluate typicality, the Court must inquire "whether the named plaintiffs' claims are

typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs

are aligned with those of the class."  *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006)

(internal quotations omitted).  "The typicality requirement is intended to preclude certification of

those cases where the legal theories of the named plaintiffs potentially conflict with those of the

absentees."  *Georgine*, 83 F.3d at 631 (internal citation omitted).  "The inquiry assesses whether

the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." *Id.* (internal citation omitted). However, "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Prudential*, 148 F.3d at 311 (internal quotation omitted).

As a food and beverage worker at the Philadelphia sports complexes, Mr. Williams was paid under the same payroll policies as the rest of the Class Members, and those payroll policies form the basis of the Complaints in these cases. Thus, his claim arises from the same overall "practice or course of conduct" as the rest of the proposed class, and the typicality requirement is satisfied.

4.    Adequacy

Class representatives must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Beck*, 457 F.3d at 296 (internal quotations omitted). It "assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." *Id.* (internal quotation omitted). Thus, the Court "must determine whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class." *Johnston*, 265 F.3d at 185 (internal citation omitted). "The Court of Appeals for the Third Circuit has noted that the [typicality and adequacy] inquiries tend to merge because both evaluate the relation of the claims and the potential conflicts between the class representatives and the class in general." *Boone v. City of Philadelphia*, 668 F. Supp. 2d 693,

7

706 (E.D. Pa. 2009) (citing *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006)).

Based upon the unchallenged and credible representations made to the Court, it appears that Class counsel is "exceedingly experienced" in complex class action litigation, including employment litigation and wage and hour cases such as this matter. Indeed, Class counsel repeatedly comported themselves in an entirely professional and proficient manner in each interaction with the Court.[4] As to Mr. Williams, he satisfies the adequacy requirement for the same reasons that he satisfies the typicality requirement.

### B.   Federal Rule of Civil Procedure 23(b)

After having determined that the requirements of Rule 23(a) are met, the Court must consider whether the requirements of at least one subsection of Rule 23(b) are met. Here, certification is sought under Rule 23(b)(3), which permits class actions where "the court finds that the questions of law or fact common to Class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are commonly separated into the so-called "predominance" and "superiority" requirements. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257-58 (3d Cir. 2009).

### 1.   The Predominance Requirement

To evaluate the predominance requirement, a court must determine whether common questions of law or fact predominate over any questions affecting only individual members. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008). The

---

[4]Defense counsel was no less professional and proficient. Indeed, the Court looks forward to counsel in this case appearing in matters in the future.

predominance requirement is normally satisfied where plaintiffs have alleged a common course of conduct on the part of the defendant. *See e.g., Prudential*, 148 F.3d at 314-315. Mr. Williams identifies several common questions of law and fact, which he claims predominate over individual issues, including:

- Whether Aramark engaged in a pattern or practice of not paying the Class for all hours worked;

- Whether Aramark engaged in a pattern or practice of failing to pay overtime to Class Members;

- Whether Aramark failed to compensate Class Members for working during unpaid meal and/or rest periods;

- Whether Aramark was obligated to compensate Class Members for all time worked at the sports complexes;

- Whether Aramark violated the MWA and/or WPCL;

- Whether Aramark failed to maintain proper records of hours worked;

- Whether Aramark properly paid gratuities.

Certainly individual issues with regard to, for instance, the hours a particular employee worked or during which time period would arise should the case go to trial. Because the suit turns on whether or not Aramark's overarching payroll practices violated various wage and hour statutes (an issue common to the class), however, the Court finds that the predominance requirement is satisfied.

   2.  The Superiority Requirement

  To meet the superiority requirement, plaintiffs must show that a class action, rather than

individual litigation, is the best method for achieving a fair and efficient adjudication of the controversy.  *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191 (3d Cir. 2001).  Several factors are relevant to the superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; © the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  In effect, "[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  *Prudential*, 148 F.3d at 316 (internal quotations omitted).  Here, the prospect of some 5000-plus individual claimants attempting to bring individual claims for relatively small dollar amounts weighs strongly in favor of the superiority of a class action.

### C.      Conclusion

Because all of the 23(a) and (b)(3) requirements have been met, the Court hereby certifies the Class as defined above for settlement purposes.

## II.    Notice

Class members must be given the best notice practicable under the circumstances, including individual notice to all potential class members that can be identified through reasonable effort.  *See* Fed. R. Civ. P.  23(c)(2)(B).   Notice

> must, in clear, concise and plain language, state: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) the class member's right to enter an appearance by an attorney; (v) the class member's right to be excluded from the class; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of settlement on class members.

*Id*.  "A court must determine that notice was appropriate before evaluating the merits of the settlement itself."  *Boone*, 668 F.Supp. 2d at 709 (citing *Prudential*, 148 F.3d at 326-27).

Here, the notice met all the requirements of Rule 23(c)(2)(3).  It detailed the Class claims, the proposed settlement, and the Class Members' right to object or be excluded from the settlement, as well as the requirements of opting in under the FLSA.  Notice was sent by mail to 5,814 Class Members.[5]  Three other Class Members filed claim forms after identifying themselves as Class members to the claims administrator.   In total, 1,374 members (23.62% of the class, representing 34.46% of the Qualifying Workweeks) submitted claim forms.[6]  No class members objected, but 30 (less than 1% of the class) opted out.  Even claims submitted late or incomplete were counted.

The response to the notice in this case is not out of line with other class actions.  *See, e.g., Hall v. Best Buy*, 274 F.R.D. 154 (E.D. Pa. 2011) (14% of the class submitted claim forms); *Boone*, 668 F. Supp. 2d 693 (15% of the class submitted claim forms).  Moreover, Plaintiff's counsel stated at the final fairness hearing that his office fielded several calls from Class Members, who asked questions demonstrating an understanding of the notice mailed to them.  Based on all of these factors, the Court is satisfied that the Class Members received adequate notice.

## III.   Final Approval: Whether the Settlement is Fair, Reasonable and Adequate

---

[5]     To the extent that notices were returned as undeliverable, the settlement administrator made reasonable efforts to find updated addresses to which the notice could be mailed.

[6]     Because the claims totaled less than 40% of the Qualifying Workweeks, the settlement pool was adjusted upwards, and the average claimant will receive approximately $101.49.  The largest claim payable is estimated at $559.74.

To grant final approval, the Court must conclude that the proposed settlement is fair, reasonable and adequate.  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 258; Fed. R. Civ. P. 23(e).  Trial courts generally are afforded broad discretion in determining whether to approve a proposed class action settlement.  *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995).  This discretion is conferred in recognition that "[the] evaluation of [a] proposed settlement in this type of litigation . . . requires an amalgam of delicate balancing, gross approximations and rough justice." *City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1380, 1385 (S.D.N.Y. 1972), *aff'd in part and rev'd in part on other grounds*, 495 F.2d 448 (2d Cir. 1974).  Thus, the Court considers whether the proposed settlement is within a "range of reasonableness" that  experienced attorneys could accept in light of the relevant risks of the litigation.  *See Walsh v. Great Atlantic and Pacific Tea Co.*, 96 F.R.D. 632, 642 (D.N.J.), *aff'd*, 726 F.2d 956 (3d Cir. 1983).  In determining what falls within this range, the Court also bears in mind "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion . . ." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

The Third Circuit Court of Appeals has set forth nine factors to be considered when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation;(2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation…

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations and punctuation marks

omitted); *Prudential*, 148 F.3d at 317.[7]  In *Prudential*, the Third Circuit also identified additional

non-exclusive factors for courts to consider for a "thoroughgoing analysis of settlement terms."

*See In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010).  Those factors include:

> [T]he maturity of the underlying substantive issues, as measured by experience in
> adjudicating individual actions, the development of scientific knowledge, the extent of
> discovery on the merits, and other factors that bear on the ability to assess the probable
> outcome of a trial on the merits of liability and individual damages; the existence and
> probable outcome of claims by other classes and subclasses; the comparison between the
> results achieved by the settlement for individual class or subclass members and the results
> achieved – or likely to be achieved – for other claimants; whether class or subclass
> members are accorded the right to opt out of the settlement; whether any provision for
> attorneys' fees are reasonable; and whether the procedure for processing individual claims
> under the settlement is fair and reasonable.

*See Prudential*, 148 F.3d at 323.  While the Court must make findings as to the *Girsh* factors, the

*Prudential* factors are merely illustrative of additional factors that may be useful.  Of the

*Prudential* factors, most of the considerations listed are either irrelevant to this action (e.g., the

development of scientific knowledge does not bear on this case), or will in some way be

discussed in fleshing out the *Girsh* factors.

The Court also notes that the Third Circuit Court of Appeals has held that although there

is an overriding public interest in settling class actions, district courts should apply "an even

more rigorous, heightened standard in cases where settlement negotiations precede class

certification, and approval for settlement and class certification are sought simultaneously." *Pet*

---

[7]  A settlement represents the result of a process by which opposing parties attempt to
weigh and balance the factual and legal issues that neither side chooses to risk taking to final
resolution.  Therefore, courts have given considerable weight to the views of experienced
counsel as to the merits of a settlement.  *See Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.
1977); *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant
weight should be attributed to the belief of experienced counsel that settlement is in the best
interest of the class") (internal quotation omitted).

*Food*, 629 F.3d at 350 (internal quotations omitted).  Thus, the Court must make an independent analysis of all of the *Girsh* factors (and the *Prudential* factors, as appropriate) and may affirmatively seek out information to the extent that the parties have either not supplied it or have provided only conclusory statements.  *See id.* at 350-51.

### A.      Application of the *Girsh* Factors

  1.      The Complexity, Expense and Likely Duration of the Litigation

The parties note repeatedly that Aramark vigorously contest liability in this case. Aramark has already moved to dismiss the complaints, while Mr. Williams has moved to remand the removed action to state court.  Although the parties also emphasize the amount of data exchanged, as well as the extensive number of interviews of current and former employees they have conducted, they contend that without a settlement, "the parties would have been required to conduct expensive and time consuming discovery relating to issues such as certification, liability and damages."  *See* Mot. For Final Approval at 10.  Such discovery would include extensive data analysis and the employment of experts.  Thus, this factor weighs in favor of settlement.

  2.      The Reaction of the Class to the Settlement

Although counsel in the *King* case objected to various settlement terms at the preliminary approval hearing, those concerns appear to have been addressed.  The *King* plaintiffs were specifically excluded from the Class, and no other Class members have filed an objection. Indeed, less than 1% of the Class have opted out of the settlement.  This factor clearly weighs in favor of the proposed settlement's fairness and adequacy.  *See In re Cendant Corp. Prides Litig.*,

14

264 F.3d 201, 234-35 (3d Cir. 2001) (low number of objectors and opt-outs strongly favors

settlement).

        3.      The Stage of the Proceedings and the Amount of Discovery Completed

       Counsel for Mr. Williams submitted affidavits indicating that they conducted "extensive"

investigation into Mr. Williams' allegations.  Specifically, they assert that they interviewed

"numerous" current and former Aramark employees, met with officials of unions representing

Aramark employees, reviewed "thousands and thousands of pages of documents" describing the

time-keeping and payroll practices at issue in this lawsuit, and had "countless" conversations

with counsel for Aramark regarding Mr. Williams' claims, discovery of relevant documents

(including payroll records), and settlement.  Similarly, counsel for Aramark conducted their own

independent investigation which included interviews with employees of Aramark, including

those specifically responsible for implementing Aramark's payroll practices, and a significant

sampling of payroll and timekeeping documents.[8]  Based on counsels' representations regarding

the effort expended on performing a preliminary review of the relevant payroll documents, the

Court is satisfied that the parties have "'an adequate appreciation of the merits of the case,'" and

that this factor weighs in favor of approving the settlement.  *See Prudential*, 148 F.3d at 319

(quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768,

813 (3d Cir. 1995) ("*G.M. Trucks*")).

       4. & 5.  The Risks of Establishing Liability and Damages

       The parties claim that their investigations and the documents and data produced,

---

[8]      At the hearing, however, Plaintiff's counsel noted several other discovery issues that would still need to be addressed, and the docket in this case still reflects outstanding motions to dismiss and for remand.

reviewed and discussed in great detail, allowed both parties to intelligently, and in good faith,

weigh both the risks and strengths of the lawsuit and the merits, or lack thereof, of the defenses.

Josephson Decl. at ¶¶5-6.  These discussions and the information exchanged highlighted the

legitimate problems with the claims at issue, as well as the tremendous costs and substantial

difficulty associated with reviewing and auditing tens of thousands of pages of payroll data if this

case were not settled.  *Id.* at ¶ 7.  More specifically, the discussions and investigations revealed

that (1) the large majority of the Class worked significantly less than 40 hours a week and were,

in large part, short-term, part-time employees; (2) the allegations of pre- and post-shift

off-the-clock work simply could not be substantiated in many instances and, in fact, could be

objectively refuted by the Defendants' payroll documents; (3) Defendants only utilized an

automatic meal period deduction for a short period of time over two years ago and for only a

small group of employees who did take meal breaks at least for some of their shifts; (4)

Defendants failed to properly aggregate hours worked at different facilities during the same

workweek only for a very small percentage of employees who were owed a *de minimis* amount of

money for the Defendants' payroll errors, and even in these few instances where Defendants may

not have properly paid one or more persons in the Class, *e.g.*, for all hours worked at the

appropriate rates of pay, it would be entitled to significant offsets for overpayments of wages to

the Class; and (5) Defendants' payroll records were confusing to the average employee, but could

explained by pulling data and documents from various sources within the Aramark organization.

*Id.*  Because the Class would face very real risks in establishing liability and damages should the

case continue without settlement, this factor weighs in favor of settlement.

      6.      The Risks of Maintaining the Class Action Through Trial

The parties discount this factor as insignificant, but note in their motion that there are significant risks to maintaining certification.  When asked about this issue at the final fairness hearing, counsel for Mr. Williams acknowledged potential problems with typicality, but noted that, despite the expectation that Aramark would vigorously contest class certification, he was confident that any problems would be solved ultimately.  The Court finds that the likelihood of a hard-fought certification battle weighs in favor of settlement.

> 7.    The Ability Of The Defendant To Withstand A Greater Judgment

This factor is not relevant to this case.  Not every factor need weigh in favor of settlement in order for the settlement to be approved by the Court as fair.

> 8. & 9.  The Range of Reasonableness of the Settlement in Light of the Best
> Possible Recovery and the Attendant Risks of Litigation

"The reasonableness of a proposed settlement depends in part upon a comparison of the present value of the damages the plaintiffs would recover if successful, discounted by the risks of not prevailing."  *Boone*, 668 F. Supp. 2d at 712 (citing *In re General Motors*, 55 F.3d at 806).  The types of claims asserted in this case allow for the collection of a fixed amount of modest damages, and, as noted above, the risks of recovering even those small damages seem daunting.  Therefore, the Court finds that this factor weighs in favor of settlement.

**B.    Conclusion**

When considering all of the *Girsh* factors, the Court is satisfied that the settlement is fair and in the best interest of the Class.

**IV.   FLSA Collective Action**

The parties also seek to certify a collective action under the FLSA.  Courts in this circuit

have held that the inquiry into whether a case should be certified as a collective action under the FLSA "largely overlap[s]" with Rule 23 analysis.  *See Bredbenner v. Liberty Travel, Inc.*, Civil Action Nos. 09-905, 09-1248, 09-4587, 2011 WL 1344745, *17 (D.N.J. Apr. 8, 2011); *see also In re Janney Montgomery Scott LLC Fin. Consultant Litig.*, Master File No. 06-3202, 2009 WL 2137224, *6 (E.D. Pa. Jul. 16, 2009).

In short, to certify a collective action, the Court must be satisfied that (1) all members of the collective action have affirmatively consented to join, and (2) all members of the collective action are "similarly situated."  *See Bredbenner*, 2011 WL 1344745 at *17.  The first factor has clearly been met here, as the notice to the Class explicitly states that only those Class Members who file a claim will be deemed to have opted in for FLSA purposes and that those Class Members who do not respond do not waive any FLSA claims.  To determine whether collective action members are "similarly situated," courts look at: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations."  *See id.* (internal quotation omitted).  For essentially the same reasons the Court found that the Rule 23 requirements were met, the Court also finds that the FLSA collective action requirements are met in this case.

## V.      Attorneys' Fees

Under the Settlement Agreement, Plaintiff's counsel requests an award of 33% of the settlement fund for attorneys' fees and costs.  This would amount to $193,875.  No class members have objected to this award, and according to Mr. Josephson's declaration, counsel's

actual fees would amount to substantially more than the amount requested.[9]

           1.     The reasonableness of fees

An award of attorneys' fees is a discretionary matter, considering the unique factors of the case.  *See In re Computron Software*, 6 F. Supp. 2d 313, 321-23 (D.N.J. 1998); *Prudential*, 148 F.3d 283, 338 (3d Cir. 1998).  There are two conventional methods of calculating attorneys' fees in class actions – the percentage of recovery method and the lodestar method.  *See In re Prudential*, 148 F.3d at 332-33.  The percentage-of-recovery method is often favored in cases involving a common fund, because it rewards counsel for success and penalizes counsel for waste or failure.  *G.M. Trucks*, 55 F.3d at 821.

There are several factors that a district court considers when setting percentage attorney fee awards in percentage-of-recovery cases:  (1) the amount of the value created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; (7) the awards in similar cases; (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups; (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and (10) any innovative terms of settlement.  *In re Diet Drugs Product Liability Litigation*, 582 F.3d 524, 541 (3d Cir.

---

[9]     The Court notes that the hourly rates set out in Mr. Josephson's declaration exceed those found in the CLS schedule of rates for attorneys of similar experience.  Thus, if the Court were to perform a traditional lodestar analysis, the Court would not necessarily accept the rates Mr. Josephson and his colleagues put forth.  Even reducing the rates to CLS levels, however, the actual "earned" fee amount likely would meet or exceed the amount requested.

2009); *Gunter v. Ridgewood Energy Corporation*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)).  This is

not an exhaustive list.  The Third Circuit Court of Appeals also has noted several other factors,

stating that "[w]hat is important is that the district court evaluate what class counsel actually did

and how it benefitted the class."  *Prudential*, 148 F.3d 283 at 338, 342.  Moreover, "fee award

reasonableness factors 'need not be applied in a formulaic way' because each case is different,

'and in certain cases, one factor may outweigh the rest.'"  *AT&T Corp.*, 455 F.3d at 166 (citing *In*

*re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2005) (internal quotations omitted)).

Recently, another court in this District took note of a study of class action fee awards

within the Third Circuit Court of Appeals, and determined that the average attorney's fees

percentage in such cases was 31.71% and that the median fee award was 33.3%.  *See Boone*, 668

F. Supp. 2d at 714 (internal citations omitted).  According to these numbers, the fee award being

sought in this case is within the acceptable range.  Moreover, given the large number of Class

members benefitted, both in terms of the monetary settlement and in terms of the new

mechanisms established to help Aramark employees better understand the payroll system, as well

as the many litigation risks discussed above that could ultimately prevent counsel from

recovering any fees and the time that counsel has expended in investigating and settling this case,

the Court finds that an attorneys' fees award of 33% is reasonable and certainly earned.

**Conclusion**

For all of the foregoing reasons, the Court grants the Motion for Final Approval of

Settlement.  In so doing, the Court certifies the Rule 23(b)(3) settlement Class and an FLSA

collective action, finds that the settlement is fair, and approves the reasonable attorneys' fees

sought by counsel.  An appropriate Order follows.

BY THE COURT:
C/A #10-1044 and C/A #10-1547


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge